**Alan GRAYSON, Appellant,**

**v.**

**AT & T CORPORATION, et al., Appellees.**

**No. 07–CV–1264.**

District of Columbia Court of Appeals.

Argued March 4, 2009.

Decided Sept. 17, 2009.

Amended Jan. 20, 2011.

Frederick D. Cooke, Jr., Washington, DC, for appellant.

Daniel R. Forman, Washington, DC, and Jay P. Lefkowitz, New York, NY, with whom Charlotte E. Gillingham, Ashley N. Bailey, Michael F. Williams, Jennifer K. Hardy, Washington, DC, Gregory L. Sidmore, John E. Villafranco, and William M. Bailey, Washington, DC, were on the brief, for appellees.

Before REID and KRAMER, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

Appellant, Alan Grayson, appeals the trial court's dismissal of his District of Columbia False Claims Act ("FCA")[1] claim[2] against AT & T Corporation, MCI Worldcom Communications, Sprint Corpo-

---

1. D.C.Code § 2–308.14 et seq. (2006 Repl.).

2. As issued on September 17, 2009, this opinion, *Grayson v. AT & T Corporation*, 980 A.2d 1137 (D.C.2009), also covered a claim under the District of Columbia Consumer Protection Procedures Act ("CPPA"), but we granted rehearing en banc as to that issue on February 22, 2010. *Grayson v. AT & T Corporation*, 989 A.2d 709 (D.C.2010). The en banc oral argument took place on June 22, 2010. Because we have addressed the CPPA issue in a separate opinion released today, we issue this amended opinion covering only the FCA claim.

ration, Verizon Communications Corporation, and the corporations' chief fiscal officers (collectively "appellees").[3] These claims involved the unused balance on telephone calling cards (escheated telephone calling card prepayments), and Mr. Grayson describes his lawsuit as "a 'whistleblower' action" to recover funds belonging to the District. The trial court dismissed Mr. Grayson's FCA claim after concluding that the allegations forming the basis for his claim had been publicly disclosed and that Mr. Grayson was not the original source of the publicly disclosed information. We affirm the trial court's dismissal of Mr. Grayson's FCA claim.

## FACTUAL SUMMARY

### Mr. Grayson's Amended Complaint

On March 26, 2004, Mr. Grayson filed an amended complaint in which he set forth as a cause of action: "Violation of the Unclaimed Property Act and False Claims Act." He brought his action as a qui tam plaintiff in the interest of himself and the general public.[4] His complaint included the following allegations:

he "served as the President of a communications business in 1990 and 1991" which sold prepaid calling cards; "[h]e is

a member of the International Prepaid Communications Association, the trade association for prepaid calling cards," and has "edited one of the two leading industry surveys of prepaid communications"; and he "has obtained and used prepaid calling cards in [the] District." [5]

An owner of a prepaid calling card "pays a deposit for the card ... [to] establish[ ] an account with the prepaid communications company holder of the funds, and his prepayment is a deposit or advance payment." "[T]he Defendants record the balance of the owner's prepayment in terms of dollars and cents." They then deduct the cost for using the prepaid calling card from the advance payment until the owner of the card exhausts the advance payment. When an owner of a prepaid calling card fails to exhaust the value of the card, the remaining balance is known as breakage.

The appellees account for a substantial amount of the $4 million to $6 million a year of breakage in the District of Columbia ("the District"), which constitutes "intangible personal property [that] escheat[s] to the District." The Unclaimed Property Act ("UPA") re-

---

**3.** For purposes of Mr. Grayson's amended complaint, AT & T Corporation includes AT & T's division SmarTalk and AT & T Wireless Services, Inc; Sprint Corporation includes Sprint Communications Company Limited Partnership and Sprint International Communications Corporation; and Verizon Communications Corporation includes Verizon Washington, DC and Cellco Partnership d/b/a Verizon Wireless.

**4.** Although Count I of the complaint reads "Violation of the Unclaimed Property Act and False Claims Act," Counsel for Mr. Grayson stated in oral argument that the amended complaint does not include a separate, independent claim under the Unclaimed Property Act. Instead, he asserted, the complaint should be read to allege that Mr. Grayson has "standing ... under ... the [FCA] to bring to

the court's attention a violation of the Unclaimed Property Act." That is, "the failure of the defendants to comply with the UPA ... is ... a violation of the [FCA]."

The FCA provides, in part, that "[a]ny person who ... [k]nowingly makes or uses[,] or causes to be made or used, a false record or statement to conceal[,] avoid[,] or decrease an obligation to pay or transmit money or property to the District" "shall be liable to the District...." D.C.Code § 2–308.14(a)(7). See also footnote 70, *infra* for further discussion of the FCA claim.

**5.** Mr. Grayson explained in his amended complaint that "[t]he term 'calling card' ... refers to an individual transaction prepaying for prepaid communications, whether or not the owner receives a physical calling 'card' in exchange for his or her prepayment."

quires persons holding such property to report and deliver the property to the Mayor.[6] The appellees, however, "have been retaining [the] breakage since 1992." Mr. Grayson "discussed·this misconduct with ... MCI's Unclaimed Property Reporting Manager" who "confirmed ... that MCI has retained millions of dollars in prepaid communications breakage." MCI's Unclaimed Property Reporting Manager "also confirmed that ... his peers at ... AT & T and Sprint, ... verified that they followed the same practice." This practice stems from "a widespread deviant view in the industry that the customer's loss is the industry's gain." Moreover, the appellees knew that they had a duty to report and deliver the calling card breakage to the Mayor because their employees are members of the Unclaimed Property Holders Liaison Council ("Holders Council"). As members, they receive and read newsletters from the National Association of Unclaimed Property Administrators (NAUPA), the central organization for state adminis-

tration of unclaimed property. In the Winter of 1995, the NAUPA issued a newsletter which contained an article entitled "Virtual Money" that stated, in part:

In Europe, for a number of years stored value technology has been used for pay telephones.... Could stored value cards create a whole new class of unclaimed property? Absolutely. For those of us in unclaimed property, *there is no question* that an unclaimed money card balance represents an intangible asset which is due and owing.[7]

The Holders Council held meetings in which they discussed "the duty to report and pay or deliver prepaid calling card breakage as unclaimed property."

During a CCH State Tax Advisory Board discussion, held on April 16, 1997, accounting firms hired to conduct appellees' annual financial examinations confirmed "that prepaid calling card breakage must be reported and paid or delivered to the States and the District." [8] That "discussion was reported

6. D.C.Code § 41–117 provides:

(a) Every person holding funds or other property, tangible or intangible, presumed abandoned under this chapter shall report to the Mayor with respect to the property as provided in this section.

(b) The report must be verified....

D.C.Code § 41–119 provides:

(a) Except for property held in a safe deposit box or other safekeeping depository, upon filing a report required by § 41–117, the holder of property presumed abandoned shall pay, deliver, or cause to be paid or delivered to the Mayor the property described in the report as unclaimed, but if the property is an automatically renewable deposit, and a penalty or forfeiture in the payment of interest would result, the time for compliance is extended until a penalty or forfeiture would no longer result. Tangible property held in a safe deposit box or other safekeeping depository shall not be delivered to the Mayor until 120 days after filing the report required in § 41–117.

7. Lynden Lyman, Esq. wrote the article. Mr. Grayson claims that Mr. Lyman "has been the Managing Director of the ACS Unclaimed Property Clearinghouse since 1999, and ... is contributing editor of the legal treatise *Unclaimed Property Law and Reporting Forms*."

8. The panel for the discussion included John J. Cronin, the National Director of State and Local Tax Services for Deloitte & Touche; George J. Barry, the Principal of the State and Local Tax Division of Arthur Andersen LLP; and J. Gary Dean, a Coopers & Lybrand tax partner. The CCH State Tax Review reported the discussion as follows:

Cronin: The next subject on our agenda is one that I find interesting, prepaid telephone cards. I go into my local gas station and I buy a $20 calling card....
What happens to the unused portion of the card if there is an unused portion of the card?
Moderator: Is it unclaimed property?
Cronin: It would be. That is right exactly.

in 'Trends in Taxation: Trends in State and Local Taxation,' CCH State Tax Review (June 9, 1997)" and reprinted in the September 1997 issue of Taxes. Whenever appellees fail to include breakage on their unclaimed property reports filed with the District; or include calling card breakage as revenue in their financial records; or substantially under-report prepaid calling card revenue to the Federal Communications Commission (FCC); or include breakage as revenue or profit on their tax returns and revenue reports; or certify on a Clean Hands Self–Certification Form that they do not owe more than $100.00 to the District,[9] the carriers make false statements "to conceal, avoid or decrease the obligation to pay or transmit breakage to the Mayor" in violation of the FCA. Appellees made at least one or more of these false statements each year from November 1, 1997 to 2003, and have "engaged in the trade practice of soliciting and accepting communications prepayments, and then failing to pay or deliver to the Mayor the unused balances of prepaid calling cards ..., in violation of D.C.Code §.41–119 and D.C.Code § 2–308.14."

### Appellees' Motion to Dismiss

On March 20, 2007, appellees moved to dismiss Mr. Grayson's complaint pursuant to Super. Ct. Civ. R. 12(b)(1) and 12(b)(6).

The appellees maintained that the trial court should dismiss Mr. Grayson's FCA claim for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief may be granted. They argued that the NAUPA newsletter[10] and CCH State Tax Review article "placed into the public domain specific 'allegations or transactions' on which [Mr. Grayson's] claim rests well before he filed this action," and that Mr. Grayson was not the original source of the information; hence, there was a jurisdictional bar to his complaint. Relying in part on *United States ex rel. Findley v. FPC–Boron Employees' Club*, 323 U.S.App.D.C. 61, 73, 105 F.3d 675, 687 (1997), appellees argued that "the tax and journal reports described in [Mr. Grayson's] complaint disclosed 'the questionable legality' of withholding phone card breakage, and ... [t]hese disclosures placed 'enough information in the public domain to identify' with 'no trouble' the 'allegedly fraudulent transactions' of particular calling card providers." Appellees acknowledged that prior to the filing of Mr. Grayson's complaint, the news media had not reported "that the failure to treat breakage as unclaimed property violated the District of Columbia's False Claims Act and/or Consumer Protection Law." But they maintained that similar circumstances existed in *Findley*, where the court declared that the " 'ability to recognize the *legal consequences* of a publicly disclosed

---

**9.** The Clean Hands Self–Certification Form reads in relevant part: "The District government·shall not issue or reissue any license or permit if the applicant owes more than $100.00 in outstanding debt to the District of Columbia."

**10.** Although it was not quoted in appellees' motion to dismiss, the excerpt from the "Virtual Money" article that appeared in the NAUPA newsletter, and which maintained that "an unclaimed money card balance represents an intangible asset which is due and owing," continued, stating:

The stored value card industry may attempt to argue otherwise. Undoubtedly, part of the profitability of the stored value card business are outstanding card balances and the float·they generate. State administrators need to ensure that the stored value card industry does not seek to retain such balances *in perpetuity, or alternatively, seek to service charge "dormant" card balances.* This is indeed an area where the states would be well-served to draft legislation concerning the abandonment of stored value card balances, while the industry is still relatively young.

fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed.' "[11]

Furthermore, appellees claimed in their motion to dismiss that Mr. Grayson could not overcome the public disclosure jurisdictional bar because he was not the "original source" of the allegations in his complaint. Relying on a similar California case, they asserted that Mr. Grayson did not have "direct and independent knowledge" of the alleged fraud because he never "saw any of the alleged misconduct 'with his own eyes,' " and "even if [his] experience could be construed as providing him with specialized knowledge, such knowledge is insufficient to imbue him with 'direct and independent' knowledge."[12]

### The Trial Court's Ruling

The trial court relied on three cases decided by other courts in its November 7, 2007 oral ruling granting appellees' motion to dismiss. With respect to the FCA's subject matter jurisdictional bar based on prior disclosures in the news media, the trial court found *State ex rel. Grayson v. Pacific Bell Tel. Co.*, 142 Cal.App.4th 741, 48 Cal.Rptr.3d 427 (2006), "persuasive in its analysis" and *United States ex rel. Alcohol Found., Inc. v. Kalmanovitz*, 186 F.Supp.2d 458 (S.D.N.Y.2002) "very persuasive." The trial court stated that the New York case "found that the publications of scholarly scientific periodicals meet the definition of news media," and implicitly determined that the NAUPA

newsletter and CCH publication also fell into the category of "news media." Looking to the California case, the trial court "f[ou]nd[ ] that the issues regarding these calling cards and whether they're unclaimed property is substantially similar to what the plaintiff seeks to raise in his [amended] complaint; and therefore, he does not meet the definition of having filed his lawsuit prior to the information being in the public domain." The trial court further declared that Mr. Grayson's FCA claim would be barred unless he was "the original source" of his FCA allegations. The court cited the case of *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007) in concluding that Mr. Grayson had not established a record showing that he was the original source of the allegations on which his complaint is based. As the trial court put it, in part, he has "failed to allege in the complaint ... how his generic involvement in the [telecommunication] industry gave him firsthand knowledge that the defendants were defrauding the government."

### ANALYSIS

#### Standard of Review

■ "Whether the trial court has subject matter jurisdiction is a question of law which this court reviews *de novo*."[13] We also review "a dismissal for failure to state a claim *de novo*."[14] Furthermore, the Supreme Court has stated that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed fac-

---

11. *Findley, supra,* 323 U.S.App.D.C. at 74, 105 F.3d at 688.

12. On July 24, 2007, appellees filed a "Joint Request for Judicial Notice and Notice to the Court of Subject Matter Jurisdictional Issue." They asked the trial court to take judicial notice of attached publications and federal court decisions which purportedly establish that Mr. Grayson's complaint is based on

previously revealed allegations, and hence, the trial court's subject matter jurisdiction is implicated,

13. *Davis & Assocs. v. Williams,* 892 A.2d 1144, 1148 (D.C.2006) (citations omitted).

14. *Murray v. Wells Fargo Home Mortg.,* 953 A.2d 308, 316 (D.C.2008) (citations and internal quotation marks omitted).

tual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." [15] "Although for the purposes of [a Rule 12(b)(6) motion] to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." [16] Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." [17] "[A] complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" [18] And, "[b]ecause '[o]ur rules reject the approach that pleading is a game of skill in which one misstep . . . may be decisive to the outcome' and 'manifest a preference for resolution of disputes on the merits, not on technicalities of pleading,' we construe pleadings 'as to do substantial justice.'" [19] Under the Court's decision in *Ashcroft, supra* note 18, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" [20]

### The False Claims Act

Mr. Grayson contends that the trial court improperly dismissed his FCA claim because it is "not based on 'allegations or transactions [of fraud] disclosed by the news media. . . .'" [21] He maintains that "[t]here simply is no way that one could read [the statements cited in his complaint from the NAUPA newsletter and CCH State Tax Review] . . . and conclude that [the appellees] are systematically excluding dormant calling card balances from their annual District unclaimed property reports." He asserts that "[t]he newsletters do not mention [the appellees], they do not mention the District (or any State), and they do not mention unclaimed property reports." Thus, his "entire complaint is [not] 'based on' those public disclosures." Further, the CCH State Tax Review and the NAUPA newsletter are not "news media."

Alternatively, Mr. Grayson argues that if this court determines that his suit is barred by the public disclosure bar, this court should hold that he was "an original source of the disclosed information." He contends that his complaint details his seventeen years of experience as a communications industry insider, and "recounts [his] conversations [with] another industry insider, MCI's Unclaimed Property Reporting Manager"; and that these facts demonstrate that he has "'direct and independent' knowledge of the allegations" in his complaint.

Appellees support the trial court's ruling and reasoning. They contend that "the information underlying Mr. Grayson's claims had been publicly disclosed long

---

**15.** *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

**16.** *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citation omitted).

**17.** *Twombly, supra* note 15, 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted).

**18.** *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly, supra* note 16, 550 U.S. at 557, 127 S.Ct. 1955).

**19.** *Clampitt v. American Univ.*, 957 A.2d 23, 29 (D.C.2008) (quoting *Carter–Obayuwana v. Howard Univ.*, 764 A.2d 779, 787 (D.C.2001)) (other citation omitted).

**20.** *Ashcroft*, 129 S.Ct. at 1949 (quoting *Twombly, supra* note 15, 550 U.S. at 570, 127 S.Ct. 1955). We do not decide in this case whether this court will follow the "facial plausibility" standard.

**21.** *See* D.C.Code § 2–308.15(c)(2)(A), discussed *infra*.

before he filed his lawsuit." Moreover, they maintain, "the publicly disclosed information in [Mr.] Grayson's own complaint . . . gave the government what it needed" to investigate and to decide whether to file a complaint against them; and that "other [specified] news media publications confirm the breadth of the prior public disclosures." Appellees take issue with Mr. Grayson's assertion that publications like the NAUPA newsletter are not "news media"; they argue that "[t]he test for public disclosure is *not* whether all members of the general public are aware of the alleged actions, but whether the information has been placed into the public domain so that a 'stranger to the fraud' could access them and act on them as did relator." With respect to the "original source" requirement, appellees declare that Mr. "Grayson cannot rely on his self-proclaimed status as a 'communications insider' to prove direct and independent knowledge." They also maintain that Mr. "Grayson improperly relies on an alleged conversation with an MCI unclaimed property reporting manager during some unidentified timeframe," and that "[t]he knowledge acquired from any such conversation is merely 'derivative of the information of others, even if those others may qualify as original sources,' and does not satisfy the 'direct and independent' prerequisite."

As the discussion below indicates, we believe that appellees' arguments are more persuasive, and are supported by ample case law. The NAUPA and CCH Tax Review article highlighted in Mr. Grayson's complaint, and other publications identified by appellees, constitute "news media," and Mr. Grayson's FCA claim is based on allegations disclosed by those publications. In fact, the allegations in his complaint are substantially similar or substantially identical to information disclosed in those publications. Furthermore, we are unable to say on this record that Mr. Grayson is the original source of the allegations in his complaint. Therefore, Mr. Grayson has not overcome the jurisdictional bar set forth in the FCA, and we must conclude that the trial court's dismissal of the FCA claim was appropriate.

### Public Disclosure Bar

■ The FCA permits a person alleging that an entity has defrauded the District to bring a qui tam lawsuit against that entity on behalf of the District.[22] The FCA, however, provides in pertinent part that:

> [n]o person may bring an action . . . based . . . upon allegations or transactions disclosed by the news media, unless the person bringing the action is an original source of the information.[23]

We consider, first, whether the NAUPA newsletter and CCH Tax Review article publicly disclosed allegations or transactions upon which Mr. Grayson's complaint is based. To answer this question, we must determine the meaning of "based upon allegations or transactions" as used in D.C.Code § 2–308.15(c)(2)(A).[24]

22. *See* D.C.Code §§ 2–308.14(a)–(b), – 308.15(b), (e).

23. D.C.Code § 2–308.15(c)(2)(A).

24. Although the FCA does not define those phrases, the FCA's legislative history informs us that the FCA is based on California's False Claims Act, California Government Code §§ 12650–12655, which in turn was derived in large part from the Federal False Claims Act, 31 U.S.C. §§ 3729–3733. COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, REPORT ON BILL 11–705, The "Procurement Reform Amendment Act of 1996," September 24, 1996 at 3. Given the "very close similarity of California's act to the federal act," *City of Pomona v. Superior Court,* 89 Cal.App.4th 793, 802, 107 Cal.Rptr.2d 710 (Cal.Ct.App.2001), it is appropriate to turn to both California and federal cases for guidance in interpreting the FCA. Also, in interpreting the FCA, we must construe each provision of the statute 'so as to give effect to all of the

The District's FCA jurisdictional bar against qui tam actions based upon allegations disclosed by the news media is substantially similar to the federal jurisdictional bar set forth in 31 U.S.C. § 3730(e)(4)(A). Federal Circuits have interpreted "based upon allegations or transactions" variously as "actually derived from . . . public disclosure" (4th Cir.),[25] or " 'substantially similar' to 'allegations or transactions' already in the public domain" (D.C. Cir.),[26] or " 'supported by' publicly disclosed allegations or transactions," as evidenced by " 'substantial identity' between the publicly disclosed allegations [or transactions] and the qui tam complaint." (10th Cir.).[27]

The Tenth Circuit's decision in *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548 (10th Cir.1992), explained the reasoning behind its initial adoption of the "supported by" approach:

> As a matter of common usage, the phrase "based upon" is properly understood to mean "supported by." In this context, an FCA qui tam action even partly based upon publicly disclosed allegations or transactions is nonetheless "based upon" such allegations or transactions. Congress chose not to insert the adverb "solely," and we cannot, be-

cause to do so would dramatically alter the statute's plain meaning.[28]

The Tenth Circuit gave three additional reasons for adopting a restrictive meaning of "based upon": (1) to interpret "based upon" to mean "based 'solely' upon publicly disclosed information" "would impermissibly expand federal jurisdiction by allowing qui tam plaintiffs to avoid the more exacting 'original source' requirement simply by asserting an additional count"; (2) a restrictive definition promotes the federal FCA's dual goals of "encourag[ing] private citizens with first-hand knowledge to expose fraud" and "avoid[ing] civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud"; and (3) "a more restrictive interpretation of 'based upon' is consistent with practical considerations of judicial economy." [29]

A majority of Federal Circuit Courts have adopted a similar meaning of "based upon." [30] And, although the D.C. Circuit follows the "substantially similar" test, its approach is analogous to that of the Tenth Circuit, and the D.C. Circuit cited *Precision* favorably in its 1997 *Findley* decision. As the Tenth Circuit articulated in its later 1996 decision, *Fine, supra* note 27, "[t]he test is whether 'substantial identity' exists

---

statute's provisions, not rendering any provision superfluous.' *E.g., Thomas v. District of Columbia Dep't of Employment Servs.*, 547 A.2d 1034, 1037 (D.C.1988) (citing *Tuten v. United States*, 440 A.2d 1008, 1010 (D.C. 1982)) (other citation omitted).

**25.** *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 352 (4th Cir.2009).

**26.** *Findley, supra*, 323 U.S.App.D.C. at 76, 105 F.3d at 690.

**27.** *Natural Gas Royalties Qui Tam Litig. v. Pacific Gas & Elec. Co.*, 562 F.3d 1032, 1040 (10th Cir.2009) (citing *United States ex rel. Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1545 (10th Cir.1996)).

**28.** *Precision, supra*, 971 F.2d at 552.

**29.** *Id.* at 552–53.

**30.** *See United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 334 (3rd Cir.2005); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 176 (5th Cir.2004); *United States ex rel. Biddle v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 161 F.3d 533, 537–40 (9th Cir.1998); *United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 940 (6th Cir.1997); *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 567 (11th Cir.1994); *United States ex rel. Kreindler & Kreindler v. United States Techns. Corp.*, 985 F.2d 1148, 1158 (2d Cir.1993).

between the publicly disclosed allegations and the *qui tam* complaint."[31] We see little difference in effect between the "substantially similar" language as used by the D.C. Circuit and the "substantial identity" phrase adopted by the Tenth Circuit.

In *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339 (4th Cir. 1994), the Fourth Circuit determined that interpreting "based upon" to mean "actually derived from" is most consistent "with section 3730(e)(4)'s indisputed objective of preventing 'parasitic' actions...."[32] The court further stated "it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic."[33] We reject the Fourth Circuit's approach because we believe that the Tenth Circuit's current approach is most consistent with the statutory purpose of the FCA. As the D.C. Circuit said in *Findley, supra:* "[T]he Tenth Circuit reasoned that its limited interpretation of who could sue under the statute protected the incentive for private citizens with first-hand knowledge to expose fraud, but also prohibited civil actions brought by opportunists who do not contribute anything significant to the exposure of the fraud."[34]

■ Like the federal version, the purpose of the FCA is to "deter and punish false claims by authorizing individuals with *direct* and *independent knowledge* of those claims to file suit on behalf of the District as a *qui tam* plaintiff";[35] and the FCA

prohibits lawsuits brought by persons who base the suit on publicly disclosed information unless the person is the original source of that information. The FCA defines original source as

> an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the District before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, report, hearing, audit, or media disclosure which led to the public disclosure....[36]

The Seventh Circuit has indicated:

> If 'based upon' means 'actually derived from,' ... it is hard to understand the import of the 'independent knowledge' component of the original-source exception; a relator who 'actually derived' his allegations of fraud from (and therefore 'based' his allegations 'upon') information in the public domain could never avoid the jurisdictional bar by showing that he has 'independent knowledge' of the fraud. Put another way, ... once a court concludes that a lawsuit is actually derived from publicly disclosed information, asking the original-source question never affects the jurisdictional result.[37]

Similarly, in cases following the minority approach where the court "concludes that a lawsuit is *not* 'actually derived' from publicly disclosed information[,]" "the court has jurisdiction over the lawsuit *whether or not* the relator was an original

---

**31.** *Fine, supra* note 27, 99 F.3d at 1545 (citation omitted).

**32.** *Siller, supra,* 21 F.3d at 1348 (citation omitted).

**33.** *Id.*

**34.** 323 U.S.App.D.C. at 68, 105 F.3d at 682 (citations omitted).

**35.** COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, REPORT ON BILL 12–363, The "Procurement Reform Amendment Act of 1997," October 28, 1997 at 1.

**36.** D.C.Code § 2–308.15(c)(2)(B).

**37.** *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 916 (7th Cir.2009) (footnote omitted).

source of the allegations in the qui tam complaint."[38] Thus, our task is to determine whether substantial similarity or substantial identity exists between Mr. Grayson's complaint and the allegations and transactions disclosed in the NAUPA newsletter and CCH State Tax Review article.

▮ Federal case law instructs us on which "allegations and transactions" must be placed in the public domain to trigger the public disclosure bar.[39] Federal Circuit Courts have held that the public disclosure bar is triggered where the public disclosure raises the inference of fraud so as "to set the government squarely upon the trail of the alleged fraud."[40] The D.C. Circuit has illustrated this principal:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.[41]

Read appropriately, the variables of the formula are labeled as follows: "X (misrepresented state of facts) + Y (true state of facts) = Z (fraud)."[42] In other words, "a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator [only] comes forward with additional evidence incriminating the defendant."[43]

Several Circuits have addressed the issue of unnamed defendants in the context of the FCA's public disclosure bar. In *Cooper, supra* note 30, the Eleventh Circuit concluded that a Government Accountability report, Office of Inspector General Report, newspaper articles, and a prior suit against Blue Cross Blue Shield of Georgia disclosing Medicare Secondary Payer fraud did not preclude the relator's action against Blue Cross Blue Shield of Florida, where Blue Cross Blue Shield of Florida was not named in the public disclosures.[44] According to the Eleventh Circuit, requiring public disclosures to specifically identify the defendant is consistent with the statute's purpose of encouraging citizen involvement to increase the likelihood of fraud being revealed.[45] The government often knows individuals are committing fraud, but has "difficulty identifying all of the individual actors engaged in the fraudulent activity."[46] "This casting of a net to catch all wrongdoers is precisely where the government needs the help of its 'private attorneys general.'"[47]

**38.** *Id.*

**39.** Mr. Grayson relies on *Rockwell, supra,* for "[t]he proper application of the 'allegations and transactions' limitation[.]" *Rockwell,* however, focused primarily on the original source limitation, because petitioner "acknowledged that his successful claims were based on publicly disclosed allegations...." 549 U.S. at 466, 127 S.Ct. 1397.

**40.** *Natural Gas Royalties Qui Tam Litig., supra* note 28, 562 F.3d at 1041 (citing *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568 (10th Cir.1995)); *see also United States v. Alcan Elec. and Eng., Inc.,* 197 F.3d 1014, 1019 (9th Cir.1999); *Findley, supra,* 323 U.S.App.D.C. at 73, 105 F.3d at 687; *United States ex rel. Springfield Terminal Ry. Co. v.*

*Quinn,* 304 U.S.App.D.C. 347, 356, 14 F.3d 645, 654 (1994).

**41.** *Springfield Terminal Ry. Co., supra* note 41, 304 U.S.App.D.C. at 356, 14 F.3d at 654.

**42.** *Findley, supra,* 323 U.S.App.D.C. at 73, 105 F.3d at 687.

**43.** *Springfield Terminal Ry. Co., supra* note 41, 304 U.S.App.D.C. at 357, 14 F.3d at 655.

**44.** 19 F.3d at 566.

**45.** *Id.*

**46.** *Id.* (citation omitted).

**47.** *Id.* (citation omitted).

Approximately a year later the Tenth Circuit distinguished *Cooper* in *Sandia, supra* note 40. *Sandia* involved a relator who alleged that the defendant misappropriated funds in violation of the Nuclear Waste Policy Act. The Tenth Circuit held that a General Accounting Office Report and congressional hearing triggered the jurisdictional bar "[b]ecause [the] disclosures detailed the mechanics of the practice, revealed that at least two of [the defendant's] eight sister laboratories were engaged in it, and indicated the [Department of Energy's] acquiescence...." [48] In finding *Cooper* inapplicable the Tenth Circuit stated: "[w]hen attempting to identify individual actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laboratories." [49] Other circuit courts to distinguish *Cooper* have likewise focused on whether "the public disclosure at issue [is] sufficient to set the government squarely upon the trail of the alleged fraud" without the relator's assistance [50] and concluded that "[i]ndustrywide public disclosures bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures." [51]

In *Grayson, supra,* a case cited by the trial court, the California Court of Appeal upheld the trial court's dismissal of Mr. Grayson's complaint (which alleged facts substantially similar to the facts alleged in this case) against prepaid calling card companies for failure to state a claim under California's False Claims Act.[52] In arriving

**48.** 70 F.3d at 571.

**49.** *Id.* at 572.

**50.** *Natural Gas Royalties Qui Tam Litig., supra* note 28, 562 F.3d at 1041.

**51.** *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.,* 436 F.3d 726, 729 (7th Cir.2006) (public disclosure bar triggered where the "disclosures at issue ... were of industry-wide abuses and investigations" and "[d]efendants were implicated."); *see also Natural Gas Royalties Qui Tam Litig., supra* note 28, 562 F.3d at 1042 ("[T]he specific allegation that measurers of natural gas on federal and tribal lands engage in identified techniques to mismeasure gas obtained from federal or tribal properties allows the government to target its investigation toward specific actors and a specific type of fraudulent activity."); *Findley, supra,* 323 U.S.App.D.C. at 73, 105 F.3d at 687 (public disclosures raise "the specter of 'foul play' by acknowledging the questionable legality of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services" and "the public disclosures ... specifically identify the nature of the fraud ... as well as the federal employee actors engaged in the allegedly fraudulent activity.").

**52.** The California Court of Appeal summarized Mr. Grayson's allegations:

He alleges: "The Qui Tam Plaintiff in this action is Alan Grayson. Mr. Grayson served as the President of a communications business in 1990 and 1991. That business is a publicly-traded Fortune 500 international communications corporation that operates in a variety of different markets, including prepaid calling cards. It has assets of over $1 billion. Both before 1990 and since 1991, Mr. Grayson has worked from time to time on matters relating to communications, including prepaid calling cards. He is a member of the International Prepaid Communications Association, the trade association for prepaid calling cards. He edited one of the two leading industry surveys of prepaid communications. He has owned almost one million shares of stock in two different publicly traded communications companies. He reads communications industry publications and financial statements. He has obtained and used unexpired prepaid calling cards in California, the unused value of which the Defendants have failed to report and pay to the Controller. Mr. Grayson has personal knowledge concerning the prepaid communications business."

....

... plaintiff alleges that he personally discussed defendants' misconduct with Mr. John Shaw ('Shaw'), the former president of the Unclaimed Property Holders Liaison

at its decision, the Court of Appeal stated:

> Government Code section 12652, subdivision (d)(3)(A) provides, in part, that "[n]o court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a ... report ... by the news media, unless ... the person bringing the action is an original source of the information." [53]

"The information in the public domain had clearly alerted the government to defendants' failure to either report or escheat breakage." [54] The NAUPA newsletter and CCH State Tax Review article "disclosed the questionable legality of withholding phone card breakage." [55] "Moreover, plaintiff alleges that defendants failed to report the breakage to the Controller and failed to escheat the property widely

Council. Shaw told the Qui Tam Plaintiff that he had discussed on many occasions with his peers at Defendants AT & T, and Sprint, and also Nextel, the retention of prepaid communications breakage." Shaw also has admitted to plaintiff that he "often discussed prepaid calling card breakage with state officials at NAUPA [National Association of Unclaimed Property Administrators] meetings. Specifically, he spoke to officials of around ten different states. Without exception, state officials told Shaw that prepaid calling card breakage is unclaimed property that must be reported and paid or delivered to the States."

Plaintiff alleges that state officials govern NAUPA, the central organization for state administration of unclaimed property. According to plaintiff, the "chief unclaimed property administrators from all 50 states belong to this organization." The complaint further alleges that the "Winter 1995 NAUPA newsletter featured an article entitled 'Virtual Money,' which stated as follows: [¶] [']In Europe, for a number of years stored value technology has been used for pay telephones.... Could stored value cards create a whole new unclaimed property? Absolutely. For those of us in unclaimed property, there is no question that an unclaimed money card balance represents an intangible asset which is due and owing.[']"

Plaintiff asserts that holders of unclaimed property formed a parallel organization, the Unclaimed Property Holders Liaison Council (Holders Council), to influence NAUPA. Members of the Holders Council, including defendants, receive and read NAUPA newsletters, including the article featuring prepaid phone cards as unclaimed property. The allegation that balances on prepaid phone cards constitute unclaimed property was again reported in *Trends in Taxation: Trends in State and Local Taxation*, in the

CCH State Tax Review of June 9, 1997, and reprinted in 75 Taxes 467 on September 1, 1997. This article reported a panel discussion of the CCH State Tax Advisory Board and included John J. Cronin, the National Director of State and Local Tax Services for Deloitte & Touche; George J. Barry, the Principal of the State and Local Tax Division of Arthur Andersen LLP; and J. Gary Dean, a Coopers & Lybrand tax partner. The distinguished panel members from the "Big Four" accounting firms, according to plaintiff, confirmed "that prepaid calling card breakage, including unexpired breakage, must be reported and paid or delivered to the States." The relevant portion of the panel discussion appeared in the tax articles as follows:

> "CRONIN: The next subject on our agenda is one that I find interesting, prepaid telephone cards. I go into my local gas station and I buy a $20 calling card ... [.] What happens to the unused portion of the card if there is an unused portion of the card?
>
> "[MODERATOR]: Is it unclaimed property?
>
> "CRONIN: It would be. That is right exactly."

Plaintiff further alleges that Barry then added: "It is like a deposit." And he asserts that another participant stated that "[s]ome states analogize prepaid telephone cards to the gift certificate situation."

*Grayson, supra,* 48 Cal.Rptr.3d at 431–34.

**53.** *Id.* at 431.

**54.** *Id.* at 436.

**55.** *Id.* at 434.

known to be held by defendants and others." [56] Mr. Grayson "substantially repeats what the public already knows, and as a result, the public disclosure rule bars the action." [57] And, in *Findley, supra,* another case cited by the trial court, the court concluded, as the Tenth Circuit reiterated, "that the relator's allegations 'substantially repeat what the public already knows and add only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice." [58]

■■■ As in *Grayson, supra,* and *Findley, supra,* sufficient information existed in the public domain to raise an inference of fraud. In the mid–1990s, both the NAUPA newsletter and CCH State Tax Review article disclosed that the unused portion of a prepaid calling card constitutes unclaimed property and an intangible asset which is due and owing. Indeed, one participant in the Roundtable which is discussed in that article specifically referenced "escheat and abandoned property." [59] In addition, other articles, upon which Mr. Grayson's complaint is based, have disclosed that the calling card company industry routinely fails to count breakage as unclaimed property.[60] In

*Phone Card Merger Mania Card Technology,* Business and Industry, January 1998, John Frank wrote: "What the industry terms breakage, the amount of unused phone time on cards sold, generally runs about 20% on the retail side.... Breakage is pure profit for card issuers." In *Feeding Frenzy; Investing in Telephone Debit Cards,* Teleconnect, December 1994, Harry Newton stated: "You also make money on unused card balances, lost cards and cards never used. The industry has a term for this. It's called 'breakage.' The industry figures breakage is as much as 15%." He further alleged that the NAUPA newsletter and CCH Tax Review article disclosed that breakage constituted unclaimed property that must be reported. Similarly, litigation (*In re SmarTalk Teleservs., Inc. Securities Litig.,* 124 F.Supp.2d 487 (S.D.Ohio 2000); 124 F.Supp.2d 527 (S.D.Ohio 2000)) and another news article disclosed SmarTalk's, a division of AT & T, treatment of breakage as revenue. Thus, "the public disclosures provided specific details about the fraudulent scheme and the types of actors involved in it, removing this from a situation where the government would need to comb through myriad transactions performed by various types of entities in search of potential fraud." [61]

**56.** *Id.* at 435.

**57.** *Id.* at 434–35.

**58.** 562 F.3d at 1042 (citing *Findley, supra,* 323 U.S.App.D.C. at 73, 105 F.3d at 687).

**59.** *"Trends in State and Local Taxation, A Roundtable Discussion of the CCH Tax Advisory Board,"* printed in Taxes, September 1997 at 492.

**60.** The trial court did not rely on these articles in reaching its decision. However, we believe that they are essential to our conclusions because they discuss the tendency of issuers of prepaid calling cards to treat breakage as revenue rather than as unclaimed property that must be reported. "Where there will be no procedural unfairness, 'we

may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court.'" *National Ass'n of Postmasters of the United States v. Hyatt Regency Washington,* 894 A.2d 471, 474 (D.C.2006) (quoting *In re Walker,* 856 A.2d 579, 586 (D.C.2004) (no "procedural unfairness" exists where appellant "has had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto")). Nevertheless, here, we do not rely on a ground not relied upon by the trial court. Rather, we are relying on materials that were before the trial court but not mentioned in the trial court's ruling.

**61.** *See Natural Gas Royalities Qui Tam Litig., supra* note 27, 562 F.3d at 1042.

1170

Finally with respect to the public disclosure prong of the jurisdictional bar under the FCA, we are not convinced by Mr. Grayson's argument that the NAUPA newsletter and CCH Tax Review do not constitute news media. "The term 'news media' includes scholarly, scientific, and technical periodicals, including trade journals, because, like newspapers, these sources disseminate information to the public in a periodic manner." [62] We agree with the trial court that the NAUPA newsletter and the CCH Tax Review article referenced in Mr. Grayson's amended complaint fall within the ambit of technical documents and trade journals and, as such, the public disclosure bar applies.

## Original Source

▮▮▮▮ Holding that the public disclosure bar applies to this case does not end our inquiry because, pursuant to D.C.Code § 2–308.15(c)(2)(A), Mr. Grayson's FCA claim can still survive if he establishes that he was the original source of the allegations in his complaint. Mr. Grayson is an original source if he: (1) "has direct and independent knowledge of the information on which the allegations are based"; (2) "voluntarily provided the information to the District before filing an action based on that information"; and (3) his "informa-

tion provided the basis or catalyst for the investigation, report, hearing, audit, or media disclosure which led to the public disclosure...." [63] "Direct and independent" means, at a minimum, information derived from one's own efforts and not derived from others. [64] As the Tenth Circuit said in *Hafter, supra* note 63:

> To establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof. Only in this way will the district court be able to adequately identify legitimate *qui tam* actions and weed out parasitic plaintiffs who offer only secondhand information, speculation, background information or collateral research.[65]

Thus, in order to be an original source, the record must show that the qui tam plaintiff did more than apply his expertise to publicly disclosed information.

> [S]econd-hand information may [not] be converted into 'direct and independent

**62.** *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F.Supp.2d 766, 770 (W.D.Va.2008) (citing *Alcohol Found., supra,* 186 F.Supp.2d at 463; *Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1476–77 (2d Cir. 1995); *Grayson, supra,* 48 Cal.Rptr.3d at 427).

**63.** D.C.Code § 2–308.15(c)(2)(B).

**64.** *See, e.g., Findley, supra,* 323 U.S.App. D.C. at 76, 105 F.3d at 690 ("[I]n order to be 'direct,' the information must be first-hand knowledge. In order to be 'independent,' the information known by the relator cannot depend or rely on public disclosures."); *see also United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1162 (10th

Cir.1999) ("Direct and independent knowledge is knowledge 'marked by the absence of an intervening agency ... [and] unmediated by anything but the relator's own labor.'") (citation omitted); *McKenzie, supra* note 31, 123 F.3d at 941 (defining direct knowledge "as 'marked by absence of intervening agency'" and independent knowledge as "not 'dependent on public disclosure.'"); *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir.1992) ("where one would not have learned of the information but for its public disclosure, one does not have 'direct and independent knowledge' of the information.").

**65.** 190 F.3d at 1162–63 (citations omitted).

knowledge' simply because the plaintiff discovered through investigation or experience what the public already knew. Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed.[66]

As the California Court of Appeal held in *Grayson, supra*, Mr. Grayson did not work for any of the appellees and he has "fail[ed] to allege the who, what, when, where, and how of his generic involvement in the industry giving him firsthand knowledge that these [appellees] were defrauding the government."[67] Instead, Mr. Grayson relies on his experience as an insider in the industry and conversations he had with MCI's former Unclaimed Property Reporting Manager as the basis for his knowledge. But, "[n]either the fact that [Mr. Grayson] may have conducted collateral research and investigation nor that his background knowledge enabled him to understand the significance of [appellees'] failure to report establish the requisite direct knowledge within the meaning of the FCA."[68] In addition, even assuming that he qualifies as an "original source" under the FCA, Mr. Grayson failed to meet "the second requirement of original-source status, that he have voluntarily provided the information to the [District] before filing his action."[69] In short, we are satisfied that the trial court correctly concluded that D.C.Code § 2–308.15(c)(2)(A) bars Mr. Grayson's FCA claim.[70]

---

**66.** *Reagan, supra* note 30, 384 F.3d at 179 (citing *Cooper, supra* note 30, 19 F.3d at 564, 568; *Springfield Terminal Ry. Co., supra* note 41, 14 F.3d at 648, 657).

**67.** 48 Cal.Rptr.3d at 438 (citation and internal quotation mark omitted).

**68.** *Id.* (citing *Kreindler, supra* note 30, 985 F.2d at 1159); *see also Reagan, supra* note 30, 384 F.3d at 179.

**69.** *See Rockwell, supra*, 549 U.S. at 476, 127 S.Ct. 1397.

**70.** If Mr. Grayson could bring a FCA action, it is not clear from the record that appellees are correct in stating that the trial court's judgment should stand "because prepaid calling cards are not property that is subject to the UPA." The trial court did not consider the merits of this issue. Rather, the trial court determined that Mr. Grayson could not bring a cause of action under the UPA because that statute does not provide for a private right of action. As we explained in footnote 4, *supra*, Mr. Grayson does not bring a separate, independent cause of action under the UPA. Rather, his FCA claim is based, in part, on the appellees' alleged violation of the UPA. Thus, for purposes of Super. Ct. Civ. R. 12(b)(1) and (6), Mr. Grayson's amended complaint should be read as setting forth causes of action under the FCA, which relate to the purposes of the UPA, not as two separate causes of action.

The Council enacted the UPA to "mandate the report and delivery ... of any and all personal property which is abandoned...." D.C.Code § 41–101. Under the UPA, "[p]roperty means a fixed and certain interest in or right in an intangible property that is held, issued, or owed in the course of a holder's business...." D.C.Code § 41–102(16A). Mr. Grayson alleges that an owner of a prepaid calling card "pays a deposit for the card ... [to] establish[] an account with the prepaid communications company holder of the funds, and his prepayment is a deposit or advance payment." "[T]he Defendants record the balance of the owner's prepayment in terms of dollars and cents." But, the causes of action and the injuries that Mr. Grayson alleges are false claims and unfair trade practices that impact consumers who bought prepaid calling cards because appellees' alleged failure to comply with the UPA causes them to receive less value on their prepaid calling cards than the appellees stated they would receive.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court dismissing Mr. Grayson's FCA claim.

*So ordered.*