*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-1338

PHONE RECOVERY SERVICES, LLC, APPELLANT,

v.

VERIZON WASHINGTON, DC, INC., ET AL., APPELLEES.

FILED 08/16/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-2277-14)

(Hon. Michael L. Rankin, Trial Judge)

(Argued January 18, 2017                    Decided August 16, 2018)

*Jordan Rand*, with whom *Joshua D. Wolson* and *Malini Rao* were on the brief, for appellant.

*Jay P. Lefkowitz*, with whom *Gregory L. Skidmore*, *Mark A. Hiller*, *Scott H. Angstreich*, *J. William Codinha*, *Laura Steinberg*, *Christopher T. McWhinney*, *Alison L. Nadel*, *Emily Crandall Harlan*, *Megan Thibert-Ind*, *Russell M. Blau*, *Daniel D. Barnowski*, *Charles C. Hunter*, *Daniel Z. Herbst*, *Wayne C. Stansfield*, *Katherine J. Seikaly*, *Jeremy S. Newman*, *Daniel G. Morris*, *Matthew H. Kirtland*, *Rebecca E. Bazan*, *Michael P. Donahue*, *Allison D. Rule*, and *Catherine M. Hannan* were on the brief or made an appearance, for appellees.

Before BECKWITH and MCLEESE, *Associate Judges*, and KRAVITZ, *Associate*

*Judge*, *Superior Court of the District of Columbia.*[*]

BECKWITH, *Associate Judge*:  Phone Recovery Services (PRS) appeals the dismissal of a lawsuit it brought on behalf of the District of Columbia against various telecommunications providers alleged to have fraudulently underpaid taxes that the District requires such providers to charge their customers in order to fund the city's 911 emergency services.  At issue in this appeal, among other matters, is whether the fraudulent conduct PRS alleged was the sort of misconduct that had already been brought to light in news articles or other public disclosures—in which case, PRS's claim that the providers had violated the District's False Claims Act (FCA) would fall outside the category of cases the FCA allows others to bring on the District's behalf.  Following the approach taken by several federal appellate court decisions analyzing the public disclosure bar contained in the federal analog to the District's FCA, we hold that PRS's FCA claim was not precluded by the statute's public disclosure bar.  For the reasons discussed below, however, we nonetheless affirm the trial court's dismissal of that FCA claim and of two common law claims PRS included in its complaint.

---

[*]  Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

## I.    Background

The District of Columbia funds its emergency 911 call center in part by imposing a monthly tax on all wireline, wireless, and interconnected Voice Over Internet Protocol (VoIP) service providers, calculated at different rates for each line leased or sold in the District.  D.C. Code § 34-1803 (2012 Repl.).[1]  In April 2014, Phone Recovery Services brought a *qui tam* action as a relator against a number of telecommunications companies operating in the District,[2] alleging that those companies were defrauding the District of millions of dollars in 911 taxes.  The complaint[3] alleged that the providers had violated the FCA, *see* D.C. Code § 2-381.02, and breached their fiduciary duty to the District.   A third count requested an accounting to allow PRS to ascertain "the true extent to which" the providers had underpaid 911 taxes.  In compliance with the FCA, PRS filed its original complaint under seal in the Superior Court and provided the District with the opportunity to review the claim and to decide whether to intervene in the action.  D.C. Code § 2-381.03 (b)(1)(4)(A)-(B).  The District ultimately declined to

---

[1]  All subsequent citations to the D.C. Code are to the 2012 replacement volume unless otherwise specified.

[2]  The complaint stated claims against twenty-five named defendants and fifteen that were unnamed, though many were subsidiaries of others.

[3]  PRS's original complaint alleged only a violation of the FCA.  PRS later amended its complaint to add the two common law claims.

get involved, and the court unsealed the complaint. The crux of PRS's complaint was that most of the District's telecommunications companies had used fraudulent means to underpay on their 911 tax obligations—underpayment that PRS says it uncovered by relying in part upon a "proprietary methodology" developed by its principal and founder, Roger Schneider.

Roger Schneider formed PRS to investigate telecommunications firms after discovering, while serving on an Alabama county emergency services board in 1993, that one particular provider was underremitting 911 fees to the county. Schneider began to investigate other companies to determine whether they were also underremitting fees, and concluded that the problem was widespread and national in scope. According to PRS, prior to this lawsuit, it had launched more than fifteen "911 fee recovery efforts" in different jurisdictions around the country, based in large part on the "proprietary methodology" Mr. Schneider had developed for calculating underremitted 911 fees.

PRS alleged in its complaint that, by applying its "proprietary methodology" to the defendants in the District, it determined that each defendant had underpaid taxes in three ways, and had done so intentionally, knowingly, or recklessly. First, the complaint alleged that each defendant miscategorized the service that it provided in order to take advantage of the different tax rates for wireline services

and VoIP services. *See* D.C. Code § 34-1803. More specifically, PRS claimed that each defendant classified the service it provided to its customers as a wireline primary rate interface (PRI), organized into private exchange stations and ordinarily taxed at $0.62 per station, when the defendant was actually providing a VoIP service that should be taxed at $0.76 per line, trunk, or path. By classifying a service as PRI rather than VoIP, a company might save up to $0.14 per transaction. Second, the complaint alleged that even where a defendant correctly classified the service provided as a wireline PRI service, the defendant undercharged for that service. To demonstrate how a company might undercharge, PRS attached to the complaint a phone bill of one of the provider's customers in which the provider did not use the correct trunking ratio to arrive at the proper charge. Finally, the complaint alleged that some companies did not pay 911 taxes at all—a claim in apparent tension with the coinciding assertion in the estimation-of-damages section of the complaint that each one of the companies had underremitted taxes at a rate of 31.7%.

In their motion to dismiss, the phone companies attached thirteen news articles that in their view constituted public disclosures precluding PRS's FCA claim.[4] These articles described allegations that various telecommunications

---

[4] *AT&T Faces Additional County Lawsuit over 911 Fees*,
(continued…)

companies failed to pay adequate 911 taxes by means such as "intentionally undercount[ing] lines used to calculate and remit 911 charges,"[5] issuing reports that listed fewer business phone lines than the company actually provided,[6] charging for a landline rather than multi-line commercial service,[7] and paying a wireless fee "based only on the number of active customers who had purchased prepaid service directly from [the provider], as opposed to the number of

---

(…continued)

Telecommunications Reports' State NewsWire, Apr. 23, 2012; Brandon Gee, *Tennessee 911 Districts Suing AT&T over Fees*, Knoxville News-Sentinel, Nov. 26, 2011; Todd South, *Hamilton County 911 Suing AT&T over Unpaid Fees and False Reports*, Chattanooga Times Free Press, Nov. 15, 2011; *Lawsuit Filed Against Two Telephone Companies Regarding 911 Fees*, WBIR, June 13, 2011; Brandon Gee, *AT&T, Charter Sued over 911 Phone Fee*, The Tennessean, June 13, 2011; Amos Bridges, *911 Advisory Board Pursuing AT&T Audit*, News-Leader, July 23, 2010; David Holden, *Judge To Rule Later on 911 Board's Lawsuit*, Huntsville Times, Feb. 18, 2009; *Indiana—Wireless Board, TracFone Talk Settlement in '911' Fee Dispute*, Telecommunications Reports' State NewsWire, Sept. 10, 2008; *Indiana—Wireless Board Concerned with TracFone's Wireless Fee Remittance*, Telecommunications Reports' State NewsWire, Aug. 21, 2008; Don Jacobs, *9-1-1 For E-911*, Knoxville News-Sentinel, July 15, 2007; *Carper Threatens To Sue Company over 911 Fees*, Charleston Gazette, Mar. 22, 2007; Lauren Gregory, *911 Board Chasing Fees Paid*, Chattanooga Times Free Press, Feb 15, 2007; *Texas—'911' Billing, Remitting Fees Measure Sent to Governor*, Telecommunications Reports' State NewsWire, June 3, 2005.

[5] *AT&T Faces Additional County Lawsuit over 911 Fees*, Telecommunications Reports' State NewsWire, Apr. 23, 2012.

[6] Todd South, *Hamilton County 911 Suing AT&T over Unpaid Fees and False Reports*, Chattanooga Times Free Press, Nov. 15, 2011.

[7] Amos Bridges, *911 Advisory Board Pursuing AT&T Audit*, News-Leader, July 23, 2010.

customers [the provider] ha[d] with [local] telephone numbers."[8] Other articles alleged more generally that it was "pretty much like the Wild West out there in telephone land today"[9] or discussed a local legislature's passage of a "bill that would give an emergency services district the authority to obtain information to determine whether the district's '911' emergency services fee is correctly billed, collected, and remitted to the district."[10] Seven of these articles described conduct within various counties in Tennessee, and the remainder focused on conduct in five other states.[11] None described fraudulent activity in the District of Columbia.

The trial court, applying a version of the FCA that preceded a 2013

---

[8] *Indiana—Wireless Board, TracFone Talk Settlement in "911" Fee Dispute*, Telecommunications Reports' State NewsWire, Sept. 10, 2008.

[9] Lauren Gregory, *911 Board Chasing Fees Paid*, Chattanooga Times Free Press, Feb 15, 2007 (internal quotation marks omitted).

[10] *Texas—'911' Billing, Remitting Fees Measure Sent to Governor*, Telecommunications Reports' State NewsWire, June 3, 2005.

[11] The phone companies pull two quotes from a single article—*9-1-1 for E-911*—to suggest that some of the news articles disclosed nationwide fraud. Although this article states in a photo caption that "[e]mergency 911 centers nationwide are grappling with technology and funding challenges caused by the introduction of cell phones" and notes elsewhere that "no state in the nation audits the wireless companies for 911 surcharge collections," these quotes, particularly in the context of the rest of the article, do not suggest that phone companies are committing nationwide fraud. The article focuses instead on Tennessee's efforts to implement an auditing system in order to ensure that the state's 911 centers were adequately funded.

amendment, first found that the conduct alleged in PRS's complaint was "substantially similar" to information already publicly available through various news articles, and that PRS's FCA claim was therefore precluded by the statute's public disclosure bar.[12] Because many telecommunications companies operating in the District had a national reach, the court reasoned, articles raising the possibility that fraudulent shortchanging of 911 fees was industrywide "surely could have alerted the D.C. government to the possibility of fraud." The court further expressed concern that PRS's complaint "treat[ed] [] defendants uniformly, without identifying specific allegations against any particular one." Noting that the complaint originally named defendants that PRS later learned had ceased operating in the District before the time period at issue, and that "PRS's claims to each particular defendant [were] speculative," the court concluded that PRS had added little to what was already in the public domain. In the court's view, PRS appeared to have "arrived at its specific accusations by applying the same calculations to each defendant in accordance with its share of the wireless communications market in the District, multiplied by the number of lines the FCC allocates to the District." PRS had also applied this calculation to unnamed defendants and had admitted that

---

[12] The court likewise found that PRS did not meet the FCA's "original source" exception, D.C. Code § 2-381.03 (c-1)(2)(C), which when satisfied allows parties to proceed on an FCA claim despite triggering the public disclosure bar.

it did not know the number of lines operated or amount in taxes submitted by each defendant over the relevant time period.

For similar reasons, the court also granted dismissal of the FCA claim on the independent ground that PRS failed to plead fraud with the particularity required by Super. Ct. Civ. R. 9 (b). Finally, the court dismissed PRS's breach-of-fiduciary-duty claim and request for an accounting on the ground that PRS had not established that the defendants had a fiduciary relationship with the District.

On appeal, PRS challenges each of the trial court's findings, and we address them in turn.

## II. False Claims Act

The False Claims Act—modeled after federal legislation[13] established during the Civil War to combat defense contractors' efforts to defraud the government, *see United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)—permits both the District's Attorney General and private *qui tam* relators to recover from those who make false or fraudulent claims to the District

---

[13] *See Grayson v. AT&T Corp.*, 980 A.2d 1137, 1146 n.25 (D.C. 2009). The portion of this opinion addressing the Consumer Protection Procedures Act issue was vacated subsequent to a rehearing en banc in *Grayson v. AT&T Corp.*, 989 A.2d 709 (D.C. 2010) (per curiam).

for payment, but bars recovery where the allegations are substantially the same as public disclosures found in news reports and other public filings. D.C. Code §§ 2-381.02, -381.03. Since the federal statute's enactment, Congress has amended the Act on various occasions in attempts to strike the appropriate balance between "adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own," *Springfield Terminal Ry.*, 14 F.3d at 649, and the D.C. Council has followed suit.

## A.    Public Disclosure Bar

### 1. The 2013 Amendment

As a preliminary matter, PRS argues that the trial court erred in applying the pre-2013 version of the FCA to PRS's claims, rather than applying the version in place when the complaint was filed—the version amended in 2013—to all of the conduct at issue.[14] The 2013 amendment was significant, in PRS's view, because it limited the scope of the public disclosure bar to claims that are "substantially the

---

[14] We review issues of statutory interpretation de novo. *E.g.*, *District of Columbia v. Place*, 892 A.2d 1108, 1110–11 (D.C. 2006); *see also United States ex. rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 809–11 (11th Cir. 2015) (reviewing amendment of the federal FCA de novo).

same" as, rather than "based upon," facts available to the public.[15]  Specifically,

the District's FCA previously provided that "[n]o person may bring an action

pursuant to . . . [the FCA] *based upon* allegations or transactions . . . disclosed by

---

[15]    PRS also appears to argue that the 2013 amendment altered the jurisdictional nature of the public disclosure bar.  We agree with PRS—and with the majority of federal appellate courts interpreting the federal act—that the amendment changed the bar from a jurisdictional requirement to an affirmative defense properly asserted in a motion to dismiss pursuant to Rule 12 (b)(6).  *E.g.*, *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response Inc.*, 865 F.3d 71, 79–80 (2d Cir. 2017); *Prather v. AT&T Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017); *United States ex rel. Advocates for Basic Legal Equality, Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016).  As the Third Circuit recently noted, "Congress removed the jurisdictional language that prohibited a court from entertaining the suit if the public disclosure bar applied," while leaving "undisturbed similar jurisdictional language in neighboring provisions."  *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016).  *Compare* 31 U.S.C. § 3730 (e)(4)(A) (2009) ("*No court shall have jurisdiction* over an action under this section based upon the public disclosure of allegations or transactions" (emphasis added)) *with* 31 U.S.C. § 3730 (e)(4)(A) (2010) ("*The court shall dismiss* an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations . . . were publicly disclosed" (emphases added)).  Although the pre-amendment version of our statute lacked the obviously jurisdictional language found in and later removed from the federal provision, the District's FCA, similar to the amended federal statute, now instructs that a "court shall not dismiss an action or claim" under the public disclosure bar if "[t]he District is opposed to the dismissal."  D.C. Code § 2-381.03 (c-1)(2)(B).  Among other reasons, we decline to read the amended statute as imposing a jurisdictional requirement because allowing the government to cure a jurisdictional defect simply by opposing a motion to dismiss would run afoul of settled precedent holding that "[p]arties cannot waive subject matter jurisdiction by their conduct or confer it . . . by consent, and the absence of such jurisdiction can be raised at any time."  *See, e.g.*, *Chase v. Pub. Def. Serv.*, 956 A.2d 67, 75 (D.C. 2008)) (quoting *Customers Parking, Inc. v. District of Columbia*, 562 A.2d 651, 654 (D.C. 1989)).

the news media[.]" D.C. Code § 2-381.03 (c)(2)(A) (2001) (emphasis added). In March 2013, the D.C. Council amended this language to state that "a court shall dismiss an action or claim under [the FCA] if *substantially the same* allegations or transactions as alleged in the action or claim were publicly disclosed[.]" D.C. Code § 2-381.03 (c-1)(1) (2013) (emphasis added). The purpose of this amendment was to "make the District's false claims act consistent with federal law," 2012 D.C. Laws 19-323 (Act 15-549), which previously barred suits that alleged facts "based upon" publicly disclosed material, and which Congress, prompted by a circuit split on the interpretation of this language, amended to read "substantially the same."[16]

Courts have since recognized that the amended federal statute, barring suits alleging facts that are "substantially the same" as those already in the public domain, essentially codified one interpretation of the prior statute that read "based upon" to mean facts "substantially similar" to those publicly disclosed. *See, e.g.*, *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017) (holding that the change was "not significant," as the court had "previously interpreted the phrase 'based upon [a] public disclosure' to mean 'substantially

---

[16] 31 U.S.C § 3730 (e)(4)(A); *Grayson*, 980 A.2d at 1146–48 (describing the various interpretations by different circuits of the language "based upon").

similar to publicly disclosed allegations'") (quoting *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 n.1 (7th Cir. 2013)); *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570, 573–75 (9th Cir. 2016); *United States ex rel. Osheroff v. HealthSpring, Inc.*, 938 F. Supp. 2d 724, 732 n.10 (M.D. Tenn. 2013). In our decision in *Grayson v. AT&T Corp.*, this court also interpreted the pre-amendment language "based upon" to mean "substantially similar," 980 A.2d at 1146–48, and we likewise conclude that there is no significant substantive difference between the District's pre-amendment and post-amendment versions of the public disclosure bar.[17]

---

[17] PRS does not explain how the 2013 amendment changed the meaning of the statute, other than to state that the amendment lowered the public-disclosure bar by some unspecified metric. The one case on which PRS relies, *United States ex rel. Sanchez v. Abuabara*, No. 10-61673-civ, 2012 WL 1999527, at *3 (S.D. Fla. June 4, 2012), held that the federal amendment "broadened the ability of relators to commence *qui tam* lawsuits under the Act enormously." *Id.* at *2 (internal quotation marks omitted). But the *Sanchez* court's characterization of the amendment as an expansion reflects the fact that prior to the amendment the Eleventh Circuit had adopted a narrower reading of the public disclosure bar language. *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (emphasis removed). PRS also argues that the long title of the District's amending act signals that the D.C. Council intended to expand the ability of relator plaintiffs to bring claims:

> AN ACT . . . to make the District's false claims consistent with federal law and thereby qualify the District for additional Medicaid recoveries . . . *to expand the liability of individuals and entities* that submit false or fraudulent claims to the District, *to facilitate qui tam*

(continued…)

## 2. *Application of the Public Disclosure Bar*

As noted above, the FCA now provides that "a court shall dismiss an action or claim" brought by a *qui tam* plaintiff on the District's behalf "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . [b]y the news media." D.C. Code § 2-381.03 (c-1)(1)(C). This public disclosure bar "is triggered where the public disclosure raises the inference of fraud so as to set the government squarely upon the trail of the alleged fraud." *Grayson*, 980 A.2d at 1148 (internal quotation marks omitted). "[T]he Act bars suits based on publicly disclosed allegations or transactions," rather than general information. *Springfield Terminal Ry.*, 14 F.3d at 653 (internal quotation marks omitted). Thus, "a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui*

_____

(…continued)

>           *actions* for false or fraudulent claims by increasing the
>           rights of qui tam plaintiffs and the reward to which they
>           are entitled[.]

2012 D.C. Laws 19-232 (emphases added). This language indicates, however, that the D.C. Council's principal goal was to conform the text of the local FCA to that of the federal FCA in order to "qualify the District for additional Medicaid recoveries." To the extent that this language reveals an intent to increase *qui tam* plaintiffs' rights or the potential liability of those submitting false claims to the District, the more logical reading is that the Council intended to expand the potential award for plaintiffs and penalty for fraudulent entities, not to lower the public-disclosure bar.

*tam* relator [only] comes forward with additional evidence incriminating the defendant." *Grayson*, 980 A.2d at 1148 (quoting *Springfield Terminal Ry.*, 14 F.3d at 655) (alterations in original).

Here, PRS's complaint alleged that every defendant misclassified VoIP services as PRI, or some other channel service, in order to take advantage of lower surcharge assessments; that even where a device was correctly classified as a PRI device, defendants undercharged for their services; and that some defendants did not charge for or remit 911 taxes at all. The trial court, reviewing the thirteen news articles the phone companies appended to their motion to dismiss, concluded that when "taken together with common knowledge," these articles "sufficed to alert the District to the likelihood of a similar scheme within its borders" because each article described "an instance or instances of major telephone companies fraudulently shortchanging" and "some, but not all, of the articles[] raise[d] the possibility that this problem [was] industry-wide." In PRS's view, the court both misread the articles and reviewed the articles collectively at too high a level of generality to merit application of the public disclosure bar.[18]

In defending the trial court's application of the public disclosure bar, the

---

[18] We review the grant of a motion to dismiss an FCA claim de novo. *Grayson*, 980 A.2d at 1144.

phone companies contend that this court's opinion in *Grayson* and analogous federal authority compel the conclusion that PRS's allegations were substantially the same as those already made known in the media. In *Grayson*, the plaintiff-relator alleged that various telecommunication companies were retaining unused balances on calling cards, rather than remitting those balances to the District pursuant to the governing abandoned property law. 980 A.2d at 1139–40. We held that several disclosures—specifically a newsletter stating that stored value cards could constitute a class of unclaimed property, a Commerce Clearing House (CCH) State Tax Review Article discussing "that prepaid calling card breakage must be reported and paid or delivered to the States and the District," and other articles disclosing that "the calling card company industry routinely fails to count breakage as unclaimed property"—were sufficient to raise the necessary inference of fraud to trigger the public disclosure bar. *Id.* at 1140–41 (internal quotation marks omitted), 1151–52.

This case differs from *Grayson* in two important ways. As an initial matter, in *Grayson*, the publicly disclosed misconduct and the misconduct alleged in the complaint were nearly identical. 980 A.2d at 1139–43, 1150–52. The CCH State Tax Review article and other news articles described the practice of retaining unused calling card balances, rather than remitting those balances to the state—and the complaint alleged that and nothing more. *Id.* at 1141, 1151–52. These

disclosures "provided specific details about the fraudulent scheme and the types of actors involved in it, removing this from a situation where the government would need to comb through myriad transactions performed by various types of entities in search of potential fraud." *Id.* at 1152 (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1042 (10th Cir. 2009)). In the present case, the phone companies argue that "[t]he central allegation in the Amended Complaint is that telecommunications providers . . . have 'underpaid' or failed to 'remit' the proper amount of 911 Taxes," while PRS contends that none of the companies' articles alleged that these providers engaged in the specific conduct described in the complaint. In other words, the parties dispute the level of generality at which to view PRS's allegations and the resulting similarity of those allegations to the phenomena disclosed in the proffered articles.

This degree of specificity as to the method of fraud alleged in the complaint as compared to that described in prior disclosures has turned out to be significant—and often determinative—to other courts analyzing a dismissal under the federal public disclosure bar. In *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933 (7th Cir. 2012), for example, the plaintiff-relator alleged that the defendant-hospital was billing Medicare for services rendered by residents who were supervised inadequately. *Id.* at 934–35. The defendant argued that there had been prior public disclosures that "many if not all of the 125 teaching hospitals" in

the country had billed Medicare for services rendered by unsupervised residents, despite the fact that it was improper to bill for residents' services where the residents were not supervised by a teaching physician. *Id.* at 934. The Seventh Circuit held that the allegations in the complaint were different from those in the previous disclosure: "[u]nless we understand the 'unsupervised services' conclusion of the [prior disclosures] at the highest level of generality—as covering all ways that supervision could be missing or inadequate—the allegations of these relators are not 'substantially similar.'" *Id.* at 936; *see also Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831–32 (7th Cir. 2013) (cautioning against viewing allegations at a high level of generality and holding that the alleged "more sophisticated, second-generation method of violating the [Act]" were not substantially similar to the "more rudimentary scheme" previously disclosed).

The Ninth Circuit in *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016), weighed the reasoning from *Goldberg* and other Seventh Circuit cases in addressing "for the first time" whether to "approach the substantial similarity question at a high or low level of generality, and accordingly whether a complaint that is similar only at a high level of generality triggers the public disclosure bar." *Id.* at 575–77. The defendant had entered into a contract with various government agencies to design and build a Visible Infrared Imaging Radiometer Suite (VIIRS) sensor, which was to be one component of a larger

satellite system project. *Id.* at 567. While the project was underway, various public disclosures consisting of government reports and news articles revealed that many of the project's inefficiencies were due to inadequate management of the VIIRS sensor aspect of the project, among other problems attributable to the defendant. *Id.* at 567–68. The plaintiff-relator, who had been an engineer for the defendant and assigned to the sensor project, brought a *qui tam* action alleging that defendant had violated the FCA by failing to comply with numerous contractual requirements, fraudulently covering up noncompliance, and employing improper billing procedures. *Id.* at 568. The complaint also made numerous specific allegations that catalogued the method by which the defendant was committing fraud—such as the "creation of false waivers," "improper (and forged) signoffs certifying work performed," and the "failure to rectify issues relating to electrostatic discharge." *Id.*

The Ninth Circuit observed that "[i]f considered at a high level of generality, [the plaintiff's] Complaint and the public reports both discuss[ed] problems with VIIRS," but "[i]f considered at a more granular level, the allegations in [the] Complaint discuss specific issues found nowhere in the publicly disclosed information." *Id.* at 574. Surveying precedent from other federal jurisdictions, the court then concluded that the reasoning from the Seventh Circuit best "effectuate[d] the purpose of the public disclosure bar by 'strik[ing] a balance

between encouraging private persons to root out fraud and stifling parasitic lawsuits.'" *Id.* at 577 (quoting *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (emphasis removed)). The court thus went on to hold that the fraud that was alleged to be afflicting the VIIRS project was "different in kind and in degree from the previously disclosed information." *Id.* at 578.

In this case, the proffered articles explain that various telecommunication companies failed to pay adequate 911 taxes, but none states that the companies did so by misclassifying VoIP services as PRI services or by failing to apply the "trunking ratio" for PRI services so as to undercharge for PRI services. Although PRS alleged a type of fraud that could, at a high level of generality, fall within the scope of the fraud alleged in the prior media disclosures, we embrace the approach of the Ninth and Seventh Circuits and conclude that PRS's description of the precise mechanism by which the phone companies allegedly committed fraud differs markedly from the publicly disclosed misconduct for purposes of the public disclosure bar.

In this same vein, the present case is also distinguishable from *Grayson* in that the public disclosures in *Grayson* contained a clearer assertion of nationwide fraud in the relevant industry. The Seventh Circuit's decision in *United States ex*

*rel. Gear v. Emergency Med. Assocs. of Illinois*, 436 F.3d 726 (7th Cir. 2006), provides a useful illustration. The plaintiff there alleged that a medical school was billing for unbillable services performed by medical residents. *Id.* at 727. The court decided that the public disclosure bar applied because a public government report had concluded that the practice of billing for residents' services "was normal, if not universal, among teaching hospitals" and the plaintiff "was unable to describe any *other* facts underlying the suit, which therefore must have been 'based upon' the published report." *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 869 (7th Cir. 2011) (summarizing *Gear*); *see also Gear*, 436 F.3d at 729 ("It is true that . . . Gear submitted his own affidavit saying that he based his complaint on 'personal observations and experience,'" but this "self-serving affidavit is insufficient to sustain a claim that his allegations are not based on public information" where he "points to no evidence upon which this suit depends that [was] not publicly disclosed." (internal quotations marks omitted)). And similarly, in *Natural Gas Royalties*, the Tenth Circuit held that prior allegations of mismeasurement of natural gas by drilling companies constituted public disclosures of the misconduct alleged in the case where—besides providing "*specific details* about the fraudulent scheme and the types of actors involved in it" that "remov[ed] this from a situation where the government would need to comb through myriad transactions performed by various types of entities," 562 F.3d at

1042 (emphasis added)—those public disclosures also "named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices." *Id.*

The public disclosures in this case do not establish a nationwide occurrence of fraudulent underremittance by the method alleged by PRS. Rather, the articles are almost entirely confined to possible violations of the 911 tax laws in particular states. Given that laws and enforcement regimes may differ from state to state, and that there may be widespread noncompliance in one state while there is full compliance in another, the disclosures here do not provide the same basis for setting the District of Columbia "upon the trail" of the fraud alleged in this case. That makes this case very different from *Gear* and *Natural Gas Royalties* in that none of the public disclosures provided by the phone companies indicates widespread or even near universal noncompliance with every state's 911 tax law.

Based on these distinctions, we hold that PRS's allegations of fraudulent underpayment are not substantially the same as the allegations of underpayment disclosed in the media, and that the complaint was therefore not barred by these public disclosures.[19]

---

[19] Appellees also rely on *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011), for the proposition that appellant's complaint must

(continued…)

**B.     Sufficiency of Pleading Under Rule 9 (b)**

PRS argues that the trial court erred in concluding that the amended complaint fell short of providing the requisite detail to satisfy Super. Ct. Civ. R. 9 (b)'s pleading standard and therefore failed to adequately plead claims under both D.C. Code § 2-381.02 (a)(6) (holding liable one who knowingly makes a false statement material to an obligation to pay the District) and § 2-381.02 (a)(3) (imposing liability for each fraudulent claim for which a person has possession of

_____

(…continued)
be barred because the complaint "treated the defendants uniformly, without identifying specific allegations against any particular one." *Jamison* held that the public disclosure bar applied because the plaintiff claimed that around 450 defendants had engaged in one of several generally described fraudulent schemes involving medical equipment "without alleging which defendants engaged in which schemes or what particular actions were fraudulent," *id.* at 328, and because it took "no particular knowledge or effort to describe a general scheme of fraud and then list arbitrarily a large group of possible perpetrators." *Id.* at 331. Although we agree that the uniformity of PRS's allegations is significant, in our view, this deficiency is better addressed by Super. Ct. Civ. R. 9 (b). *See infra* Part II.B. *Jamison* itself noted, in its analysis of the application of the public disclosure bar, that it was "highly unlikely that [plaintiff's] original complaint satisfied the heightened pleading requirement of Federal Rule of Civil Procedure 9 (b)." *Id.* at 328 n.9. But the court had not been presented with that issue. More critically, in *Jamison*, the complaint contained only the same general allegations as those that had already been publicly disclosed. As the court stated, "one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of the joint venture scheme[.]" 649 F.3d at 331. In contrast, here, again, appellees have not proffered articles that describe the precise type of fraud alleged in this case. The specific allegations are different from the proffered disclosures, but may still fail when subjected to Rule 9 (b)'s pleading standards.

money to be used by the District and knowingly delivers less than all of it). PRS takes particular issue with the trial court's findings that PRS had provided merely "educated guesses" rather than "estimates," and that PRS had "calculated defendants' under-remittances on a uniform, rather than individualized basis." For their part, the service providers contend that PRS did little more than copy and paste "the same conclusory statements more than two dozen times" to reach a conclusion that "each and every Defendant had underpaid its 911 Taxes by the same exact percentage," revealing the unreliability of PRS's proprietary methodology and underscoring the complaint's failure to describe any specific misrepresentations unique to any given defendant. We review de novo the dismissal of a complaint pursuant to Super. Ct. Civ. R. 9 (b). *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (reviewing dismissal under the federal rule).[20]

Federal courts have held that the heightened pleading requirements of Fed. R. Civ. P. 9 (b) govern *qui tam* actions brought under the federal FCA. *See United States ex rel. Schneider v. J.P. Morgan Chase Bank, N.A.*, 224 F. Supp. 3d 48, 55–56 (D.D.C. 2016) (applying Fed. R. Civ. P. 9 (b) to the federal FCA and holding

---

[20] The parties assume we apply the same de novo standard of review that applies under Fed. R. Civ. P. 9 (b).

that "[b]ecause the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must [] comply with Rule 9 (b)" (internal quotation marks omitted)); *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (same). Our own Rule 9 (b) is identical to Fed. R. Civ. P. 9 (b),[21] and we likewise apply its pleading requirements to PRS's claim under the District's FCA. Given "the quasi-criminal nature of FCA violations" and the fact that a violator may be liable for treble damages,[22] particularity in pleading is "especially important" in FCA cases. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006). "Rule 9 (b) ensures that the relator's strong financial incentive to bring an FCA claim—the possibility of recovering between fifteen and [twenty-five] percent[23] of a treble damages award—does not precipitate the filing of frivolous suits." *Id.*

To allege fraud or mistake, a plaintiff must "state with particularity the circumstances constituting fraud or mistake" by providing the "time, place, and contents of the false representations, the facts misrepresented, and what was

---

[21] *See* Super. Ct. Civ. R. 9 cmt. (describing Rule 9 as "identical to Federal Rules of Civil Procedure 9").

[22] D.C. Code § 2-381.02 (a) (establishing liability and setting forth penalties for FCA violations in D.C.).

[23] D.C. Code § 2-381.03 (f)(1)(A) allows a *qui tam* plaintiff to "receive at least 15%, but not more than 25%, of the proceeds" of an action or settlement.

obtained or given up as a consequence of the fraud." *United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 112 (D.D.C 2013) (internal quotation marks omitted) (construing Fed. R. Civ. P. 9 (b)). A plaintiff must also "set forth an adequate factual basis for his allegations," *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002), or, in other words, "invest the complaint with indicia of reliability." *Heath*, 791 F.3d at 125 ("[T]he point of Rule 9 (b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."); *see also Sibley v. St. Albans Sch.*, 134 A.3d 789, 809 n.13 (D.C. 2016) ("To comply with the more rigorous pleading requirement of Rule 9 (b), a complaint must allege 'such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient.'").[24]

Rule 9 (b)'s requirements effectuate its purpose "to alert defendants 'as to the particulars of their alleged misconduct' so that they may respond. The

---

[24] Even under the less stringent Rule 8 (a) standard, which applies to fraud claims as well, the plaintiff "must plead 'enough facts to state a claim to relief that is plausible on its face,' i.e., 'factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged.'" *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015) (internal citation omitted)).

heightened pleading standard is also designed to prevent 'fishing expeditions,' to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (citations omitted); *see also* 5A Charles A. Wright et al., *Federal Practice and Procedure* § 1296 (3d ed. 2004) ("[T]he greater pleading specificity required by Rule 9 (b) deters the filing of suits solely for discovery purposes; the rule thus guards against the institution of a fraud-based action in order to discover whether unknown wrongs have occurred—the classic fear of 'fishing expeditions.'"). Where a complaint is filed against multiple defendants, then, "Rule 9 (b) requires that the identity and role of individual defendants alleged to have made false representations be specified in the complaint." *Sibley*, 134 A.3d at 809 n.13; *see also United States ex rel. Bender v. N. Am. Telecomms., Inc.*, 686 F. Supp. 2d 46, 53–54 (D.D.C. 2010).

PRS's complaint falls short in myriad respects. As the trial court noted, "[t]he complaint treats the defendants uniformly, without identifying specific allegations against any particular one," and nothing in the complaint suggests what PRS might have done "to winnow its list to these defendants." PRS's assertion to the contrary that it used its knowledge and proprietary methodology to identify the specific defendants named in the complaint fails to explain why PRS initially pressed claims against certain defendants that had ceased operating in the District

before 2006 or against unnamed "subsidiaries and related entities" of each named defendant.

The "proprietary methodology" itself does little to convince us that PRS's pleadings meet Rule 9 (b)'s standard. PRS contends that it conducted "individualized calculations for each [d]efendant" and that the trial court's conclusion that PRS provided the court only with "educated guesses" improperly "ignored PRS's lengthy description of its methodology." Although the complaint details PRS's methodology at some length, and although PRS modified its methodology "to determine the number of lines on which each carrier remitted or failed to remit 911 surcharges," the ostensible accuracy that this level of detail purports to convey is belied by PRS's conclusion that every single defendant underremitted 911 taxes at the identical rate of 31.7%—and further, that some defendants, though PRS cannot say which, did not remit taxes at all.

Finally, although PRS claimed that the phone companies made fraudulent misrepresentations by withholding taxes owed to the District and by falsely certifying "under penalty of law that [they had] properly collected and remitted the correct amount of 911 Taxes," this allegation is likewise inadequately pled. There is little indication that PRS has evidence that each company failed to pay the required amount in 911 taxes—let alone that they knowingly did so, as opposed to

simply interpreting applicable regulations differently or failing to establish adequate accounting procedures. The same uniformity that afflicts PRS's underremittance calculations mars its allegations regarding the providers' misrepresentations, in that PRS has presented nothing in the way of details that each defendant in fact committed fraud. Instead, PRS presents conclusory allegations—identical for every company—that each made "repeated false certifications as to the accuracy of the remittance" and that each "misrepresented to the District that the 911 taxes have been paid as required under the Act." In sum, the trial court did not err in concluding that PRS failed to satisfy the heightened standard of pleading required under Rule 9 (b).[25]

### III. Breach-of-Fiduciary-Duty and Accounting Claims

Finally, PRS argues that the trial court erred by dismissing its claims for a

---

[25] PRS asks that we forgo affirming the trial court's dismissal under Rule 9 (b) and instead grant PRS leave to amend its complaint under Super. Ct. Civ. R. 15. PRS never requested leave to amend, or reconsideration of the decision not to grant leave to amend, in the trial court. PRS does so now for the first time, but in conclusory fashion, without describing how it might modify the complaint to remedy potential deficiencies. Under these circumstances the trial court did not abuse its discretion by failing to grant leave *sua sponte*. *See Flax v. Schertler*, 935 A.2d 1091, 1105 (D.C. 2007) ("This court reviews a trial court's decision to permit or deny an amendment of pleadings for abuse of discretion."); *District of Columbia v. Tinker*, 691 A.2d 57, 60 (D.C. 1997) (same); *see also Islamic Ctr. of Nashville v. Tennessee*, 872 F.3d 377, 386–87 (6th Cir. 2017) (interpreting the analogous Federal rule and holding that the district court did not abuse its discretion by not granting leave to amend *sua sponte* where appellant never requested it).

breach of fiduciary duty and for an accounting, and specifically challenges the court's finding that the telephone companies were not in a fiduciary relationship with the District of Columbia. The companies contend that PRS did not establish the requisite fiduciary relationship but in any event lacked standing as a *qui tam* relator to assert these claims on behalf of the District.

The District's FCA confers standing on relators to pursue a limited, statutorily specified set of causes of action on behalf of the government. The statute does not, however, confer standing to assert common law claims for an injury sustained by the District. *See, e.g.*, *United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F. Supp. 2d 10, 14 (D.D.C. 2003), *aff'd sub nom. Rockefeller ex rel. United States v. Washington TRU Sols. LLC*, No. 03–7120, 2004 WL 180264 (D.C. Cir. Jan. 21, 2004) (per curiam) (relator lacked standing to bring fraud, payment by mistake, unjust enrichment claims); *United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 451–52 (S.D.N.Y. 2001) (relator lacked standing to bring fraud, mistake of fact, and unjust enrichment claims). Accordingly, we affirm the trial court's dismissal of Counts II and III on the ground that PRS did not have standing to assert either common law claim.

## IV.    Conclusion

We hold that the trial court erred in concluding that the previous public disclosures barred PRS's lawsuit against the telecommunications providers for violations of the False Claims Act, but we affirm the dismissal of the claim on the trial court's alternative ground that PRS failed to satisfy the pleading requirements in Super. Ct. Civ. R. 9 (b).  We also affirm the dismissal of PRS's claims alleging a breach of fiduciary duty and requesting an accounting.

*So ordered.*